**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**MARIO MARQUEZ,**

      **Plaintiff,**

**vs.**                                                              **No.  06cv0956 DJS**

**MICHAEL J. ASTRUE,**[1]
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** is before the Court on Plaintiff's (Marquez') Motion to Reverse or Remand the Administrative Decision **[Doc. No. 11]**, filed February 19, 2007, and fully briefed on April 30, 2007.  On May 22, 2006, the Commissioner issued a final decision denying Marquez' claim for disability insurance benefits.  Pursuant to 42 U.S.C. § 405(g), Marquez seeks judicial review of the Social Security Administration's denial of his claims for benefits under Title II of the Social Security Act.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is  well taken and will be **GRANTED**.

**I.  Factual and Procedural Background**

      Marquez, now fifty-five years old (D.O.B. April 2, 1952), filed his application for disability insurance benefits on January 3, 2005 (Tr. 13), alleging disability since July 12, 2004 (Tr.134), due to degenerative disc disease of the lumbar spine, status post L3-4 foraminotomy,

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this action.

and L5-S1 fusion performed in 1970 and a recent diagnosis of osteoarthritis and sacroiliac joint dysfunction. Tr. 15. Marquez has a Bachelor's Degree in Business Administration and an Associate Degree in Computer Technology (Tr. 122). Marquez' past relevant work was as a health care administrator, respiratory therapist, teacher, and computer software consultant. Tr. 115-116.

On May 22, 2006, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Marquez was not disabled as he retained "the residual functional capacity (RFC) to perform simple, light level work." Tr. 27. The ALJ also found Marquez' "statements concerning the intensity, duration and limiting effects of [his alleged] symptoms were not entirely credible." Tr. 17. Marquez filed a Request for Review of the decision by the Appeals Council. On April 15, 2006, the Appeals Council dismissed Marquez' request for review. Tr. 8. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Marquez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial

evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under

20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse and remand, Marquez makes the following arguments: (1) the ALJ erred at step three of the sequential evaluation process when the ALJ found he did not meet Listing 1.04 (Disorders of the Spine); and (2) the ALJ erred at step five of the sequential evaluation process when the ALJ found he was not disabled.

## A. Medical Records

On **July 2, 2004**, Cleveland Sharp, M.D., a physician with Lovelace Medical Center, Family Practice Clinic, evaluated Marquez for acute low back pain. Tr. 183-184. Marquez was seeking a new primary care physician since having a disagreement over medications with his previous physician. Marquez gave a history of having a fusion at L5-S1 in 1970 and low to moderate back pain intermittently ever since his fusion. Marquez used Robaxin and Tylenol with codeine to control his pain with good results, but the medication was not helping this new pain. Marquez complained of recently stepping into a hole which caused increased pain but no radicular symptoms. Marquez also denied neurological symptoms of his legs, perineal numbness or incontinence. Dr. Sharp evaluated Marquez, noting:

> PHYSICAL EXAMINATION: GENERAL: The patient is in moderate distress, holding himself stiffly while he's seated and rising very stiffly.
> ** ** ** ** **
> BACK: There is **extensive spasm and tenderness**. Seated straight leg is negative. Flex [illegible] degrees, extend 0 degrees, tilt 10 degrees bilaterally.
> NEUROLOGICAL: Touch sensation, motor strength and deep tendon reflexes are within normal limits in both legs.
> Lumbosacral spine films showed the fusion, but I don't see any defects in disk. Formal interpretation is pending.

>ASSESSMENT AND PLAN: Back pain, acute and chronic.  Bone scan to further check the status of the fusion.  Spine clinic referral.  Roxicet 5/325 (oxydodone and acetominophen) one to two t.i.d. p.r.n. pain (#100).
>
>FOLLOW UP: Two weeks or p.r.n.

Tr. 183, 192 (emphasis added).   The July 2, 2004 x-rays of the lumbosacral spine indicated:

>There are postoperative changes following lumbar fusion spanning L5 and S1.  There is exaggerated lumbar lordosis.  **Retrolisthesis of L3 on L4 is several millimeters**, but may be related to **degenerative disc changes are prominent posteriorly at this level and at multiple levels in the lumbar spine**.  **Disc spaces decreased posteriorly at L5-S1, L3-4 and L1-2, especially**.  No regional compression deformities are seen.  No pars defects are evident, but **degenerative facet changes are present**.
>
>Impression:
>Postlumbar fusion changes, as above.  Degenerative disc disease prominent posteriorly at multiple levels as discussed above.  This implies disc pathology and may be better evaluated by cross-sectional imaging such as MRI as indicated.

Tr. 186-187, 191 (emphasis added).

On **July 14, 2004**, Marquez had a "negative bone scan with particular reference to the spine.  Tr. 180-182, 190.

On **July 26, 2004**, Marquez returned to Lovelace Medical Center for an evaluation at the Pain Management Clinic.  Tr. 176-179.  Dr. Sharp, his primary care physician, referred Marquez for this evaluation.  Julie Muche, M.D., a physiatrist (a physician that specializes in Physical Medicine and Rehabilitation) at Lovelace Medical Center, evaluated Marquez.  Marquez complained of right-sided lower back pain for approximately one month.  Marquez reported experiencing pain in the coccyx area after half hour of sitting with some radiation to the left side and down his right lower extremity in the right thigh.  Tr. 176.  Marquez rated his pain 10 on a scale of 10 and described it as burning, shooting, throbbing, constant and worse with sitting or bending.  *Id.*  Dr. Muche noted the **x-rays done on July 2, 2004** of the lumbosacral spine showed "the past lumbar fusion changes in the L5-S1 region as well as **degenerative disk**

**disease prominent at multiple levels and several millimeter retrolisthesis at L3 and L4**." *Id.* (emphasis added)

Marquez reported he had been unable to do his weights or cardiovascular exercises for the past month because of his increased pain. Marquez also reported he woke up three to four times during the night and got about seven hours of sleep. Marquez complained of being irritable or stressed in the past month due to the pain but considered his overall health to be excellent. Marquez' main concern was to have the etiology of his "new pain" uncovered and desired to return to his usual ADLs. Tr. 177.

Dr. Muche performed a physical examination noting, in part:

Physical Exam: The patient is **shifting the position during the encounter**. He is uncomfortable and feels most comfortable lying with his knees up. He is alert and oriented x 3. He is in no acute distress. He does have a pleasant affect. Range of motion of his lumbar spine: Forward flexion is 70 degrees, extension is with extreme pain at approximately 5 degrees, extension with bilateral rotation is painful. Side bending to the right is painful but left side bending is not painful and within functional limits. **Palpation along the spinous processes at approximately the L4-5 level are tender to palpation as well as the paraspinals in the same levels**. There are no trigger points, however, elicited and he is **tender to palpation bilateral S1 joint, right more than left, and tender to palpation along the right greater trochanter**. His pelvis is level. Faber's test is positive on the right, negative on the left.

** ** ** ** **

Assessment: Acute and chronic lower back pain secondary to exacerbation and **new retrolisthesis L3 and L4**, status post fusion L5-S1.

Plan:
1. I will issue the patient his Roxicet 5 mg 1 p.o. q.4-6 hr prn for pain, dispense #90. I will also issue the patient **nortriptyline 60 mg I p.o. q.h.s. to help with his insomnia and some of his neuropathic pain**. I will issue the patient [illegible]mg of valium one hour prior to the MRI that I am ordering of his lumbosacral spine. The patient states that he would like an open MRI but hopefully sedation will work for him.
2. I will have the patient see our exercise physiologist, Christine Herman, to show him stretching exercises of his bilateral hip flexors, hamstrings, quadriceps, as well as strengthening of his bilateral quads, hams, hip extensors and left gluteal muscles. Williams Flexion Exercises with [illegible], and balance exercises. Precautions are

    no extension.  I would like her to see him for approximately six sessions to see if he is progressing in his therapies.
3. I will also **consult neurosurgery** as he is post status fusion L5-S1 and he **has new retrolisthesis of L3 and L4** with his pain exacerbated x1 month and **has right lower extremity radiculopathy**.
4. He is to follow up with me in approximately four to six weeks to review his progress with his therapies and his medications.

Tr. 178-179 (emphasis added).

  On **July 30, 2004**, per Dr. Muche's referral, Marquez consulted with Christine Herman, the exercise physiologist at the Pain Management Clinic at Lovelace Medical Center.  Tr. 174.  Marquez complained of low back and right sided radiculopathy.  Ms. Herman evaluated Marquez for "exercise evaluation prescription."  *Id.*  Ms. Herman compiled an exercise handout for him and directed him to return in two weeks.

  On **August 9, 2004**, Marquez had an MRI at the VA.  Tr. 197.  The MRI indicated **L3-4 disc bulge**, otherwise normal, without spinal stenosis or neural foraminal narrowing.  *Id.* (emphasis added).

  On **August 13, 2004**, Marquez returned for a follow up with Christine Herman.  Tr. 173.  Ms. Herman had prescribed some exercises for his lower back pain and "right sided radiculopathy."  *Id.*  Marquez reported the exercises were helping his lower back pain and the gluteals but not the coccyx area.  Ms. Herman discussed "pacing and coping and relaxation type exercises" and advised Marquez to buy a pillow to sit to help with the coccyx pain.

  On **August 19, 2004**, Marquez had a neurosurgery consultation with Mark Erasmus, M.D., neurosurgeon.  Tr. 171.  On that day, Marquez complained of severe lumbar spine pain radiating down his right leg for two months.  Marquez reported his pain was worse sitting in a chair.  Marquez denied numbness, weakness or paresthesias.  Marquez reported having a fusion in the past.  Dr. Erasmus examined Marquez, noting:

>PHYSICAL EXAMINATION: He is a well developed well nourished male who appears his stated age, is a reliable and accurate informant.  **Gait is slow and deliberate, forward bending produces more pain than backward bending.  Rotation produces pain, light touch produces pain axially, straight leg raising does not.**  Patrick's maneuver is negative.  No pain to percussion of the heels, no lower extremity edema, no calf tenderness, there is no wasting or involuntary movement, normal tone.  He has normal strength of foot dorsi and plantar flexion, knee extension and flexion, and hip flexion.  There is negative straight leg raising.  Negative cross straight leg raising.
>
>IMPRESSION: **Degenerative disk L3-4.**  I am not able to determine which level is fused.  The patient is going to provide some plain films that were done recently and I will take a look at those and call him and tell him that the fusion is intact if it is.

Tr. 171, 208.

On **August 24, 2004**, Dr. Muche, M.D., evaluated Marquez.  Tr. 169-170.  Dr. Muche noted the **August 9, 2004 MRI showed a L3-4 disc bulge without spinal stenosis or neuroforaminal narrowing.**  Dr. Muche noted Marquez complained of "pain over the higher lumbar region on the right that is facet type, transverse process region pain that he feels a bump."  Tr. 169.  **Marquez reported increased pain down this right lower extremity and new coccygeal pain, "especially after sitting for two hours in a hard chair**." *Id.*  Marquez also reported the "nortriptyline [was] working very well after he combin[ed] it with one to two tablets of Roxicet" and was "pain free for three to four hours at a time." *Id.*  Marquez reported have "a side effect of 'craving sweets,' but no other side effects with this medication." *Id.*

Dr. Muche examined Marquez and noted he had a **trigger point over the right paraspinal muscle at approximately the L4 level and coccygeal tenderness to palpation along the midline**.  Dr. Muche diagnosed Marquez with chronic low back pain status post fusion, **trigger point right paraspinal muscle and coccygeal pain**.  Dr. Muche increased the nortriptyline and recommended Marquez use a donut to sit on and issued him lidocaine 2% gel to apply topically to the coccygeal region.  Dr. Muche also administered a **trigger point**

**injection** to the right lumbar paraspinal muscle at approximately the L4 level. Tr. 170. Dr. Muche instructed Marquez to return in six to eight weeks.

On **September 2, 2004**, at the request of Dr. Erasmus, Marquez had x-rays of the lumbar spine. The x-rays indicated:

> There is slight narrowing of the L5-S1 intervertebral disc space with reasonable maintenance of remaining disc spaces. There also is very slight decrease in normal vertebral body height at L1. There is no clear evidence of spondylolysis or spondylolisthesis, nor is there evidence of spinal instability. Paravertebral soft tissues are grossly unremarkable.
>
> Impression: Degenerative changes as above described with no clear evidence of significant spinal instability.

Tr. 167-168, 207.

On **September 2, 2004**, Marquez returned to Lovelace and met with Christine Herman for a brief follow up. Tr. 165. Marquez complained of coccyx pain. Marquez reported the trigger point injections Dr. Muche administered gave him significant relief but was already experiencing return of the pain. Marquez also met with Dr. Erasmus to discuss his lumbar spine with flexion and extension x-rays (Tr. 166).

On **September 30, 2004**, Marquez met with Dr. Erasmus. Tr. 164, 206. Dr. Erasmus discussed surgery options with Marquez and its risks. Marquez agreed to an **epidural injection** and, if that failed, he would then consider surgery.

On **October 11, 2004**, Steven Bailey, M.D., a physiatrist with the Pain Management Clinic at Lovelace Medical Center, evaluated Marquez. Tr. 162-163. Dr. Bailey noted Marquez' **pain was mostly in the coccyx**. Marquez reported the August 23, 2004 trigger point injection at the right L4 paraspinous muscle relieved his pain for approximately two weeks. **Marquez complained that the pain had returned and prolonged sitting made it worse**. Tr.

162. **The physical examination showed tenderness over the right paraspinous muscles at the L4-5 level and slight tenderness of the coccyx along the midline with manipulation**.

Dr. Baily diagnosed Marquez with **"chronic low back pain, status post fusion with coccydnia[2] probably referred as evidenced by relief of pain with trigger point injection**." *Id.* **Dr. Bailey recommended lumbar epidural steroid injections**. Dr. Bailey administered a lumbar epidural steroid injection on that day. Dr. Bailey directed Marquez to return for a follow up in 6 to 8 weeks for a repeat injection if he experienced significant relief from the first lumbar epidural steroid injection. If Marquez experienced little or no relief from the injection, **Dr. Bailey recommended a repeat trigger point injection** and a TENS unit.

On **October 28, 2005**, M.L. Taylor, a physician assistant, evaluated Marquez. Tr. 160-161. Marquez' chief complaint was severe lumbar spine pain which radiated down his right leg for approximately two months. Tr. 160. Marquez denied numbness, weakness or paresthesias. *Id.* On examination, the physician assistant noted:

> PHYSICAL EXAMINATION: He is a well developed, well nourished male who appears his stated age. He is a reliable and accurate informant. Gait is slow and deliberate. **Forward bending produces more pain that backward bending. Rotation produces pain. Light touch produces pain axially**; straight leg raising does not. Patrick's maneuver is negative. No pain to percussion of the heels. No lower extremity edema. No calf tenderness. There is no wasting or involuntary movement. Normal tone. He has normal strength of foot dorsi and plantar flexion, knee extension and flexion and hip flexion. There is negative straight leg raising. Negative crossed straight leg raising.
>
> IMPRESSION: Degenerative disc L3-4. At the time of their meeting, Dr. Erasmus was not able to determine which level is fused. The patient is going to provide some plain films that

---

[2] Pain localized to the coccyx (tailbone). Coccyx pain can occur from local trauma or a tumor, but most cases are idiopathic and have no identifiable source. Coccyx pain is often relatively severe and persistent, causing significant compromise of the patient's ability to perform or endure various activities and is often associated with substantial morbidity. http://www.emedicine.com/pmr/topic242.htm

were done recently and Dr. Erasmus will review them. He will call the patient and let him know if the fusion is, indeed, intact.

Tr. 160. The physician assistant noted Marquez had been to Lovelace on September 30, 2004, and discussed surgery options with Dr. Erasmus. Tr. 160. The physician assistant noted the "**MRI was reviewed which shows L3-4 stenosis of the right side but not the left**." *Id.* Marquez was scheduled for an epidural steroid injection at that time and informed Dr. Erasmus that if the epidural steroid injection was not effective he would consider surgery. *Id.* Since the epidural steroid injection was ineffective, Marquez informed the physician assistant that he had informed Dr. Erasmus that he wanted to proceed with surgery. The **L3-4 foraminotomy** had been scheduled for October 29, 2004, at Lovelace Medical Center. Tr. 161.

On **October 29, 2004**, **Dr. Erasmus performed a right L3-4 foraminotomy**[3] for **right L3-4 stenosis**. Tr. 159. **Dr. Erasmus noted he visualized the nerve root exuding out the foramen**. *Id.* Marquez had x-rays, one view, lateral of the lumbosacral spine. Tr. 158. The x-rays indicated no fractures, mild wedging defect of L4, and degenerative changes with small osteophytes (bone spurs) in the anterior LS-spine. *Id.,* Tr. 205.

On **November 3, 2004**, M.L. Taylor, a physician assistant at Lovelace, evaluated Marquez. Tr. 156. The physician assistant noted:

> Hospital Course: This is a 52-year-old male with a history of lumbar and right leg pain who was taken to the operating room on October 29, 2004, to undergo a L3-4 foraminotomy with Dr. Erasmus. The patient tolerated the procedure well and was returned to the recovery room in satisfactory condition. Upon his arrival to the floor, he made a rapid recovery. On postoperative day #1, he was describing satisfactory ambulation and resolution of his lower extremity symptoms. He was voiding and taking p.o. and was deemed appropriate to discharge to home at this point in time.

---

[3] Foraminotomy is a surgical procedure performed to enlarge the passageway where a spinal nerve root exits the spinal canal. During a foraminotomy, the neurosurgeon removes bone or tissue that obstructs the passageway and compresses the spinal nerve root, which can cause inflammation and pain. http://www.spineuniverse.com/displayarticle.php/article554.html

*Id.* The physician assistant instructed Marquez to keep the wound clean and dry, not to lift "greater than 10 pounds for a period of six weeks," to return for a wound check in 7-10 days, and to return for a follow up with Dr. Erasmus in one month. *Id.*

On **November 9, 2004**, Marquez returned to Lovelace for a routine post-operative follow up with a registered nurse. Tr. 155. Damian Loehle, R.N. evaluated Marquez noting:

> Assessment: The patient is alert and oriented times three. He can stand from a sitting position without difficulty or assistance and has a steady gait. Upon inquiry, the patient does not claim to have any neurologic impairment at this time.
>
> Pain Level: The patient complains of some right low back and peri-incisional pain which is fairly constant in nature. **For relief, the patient states he takes one to one and a half Percocet every five hours and is also taking ibuprofen, 600 mg three times a day with food**.
>
> Activity: The patient states he has been walking in and out of the house approximately two times per day. I advised the patient at this time the need to increase his ambulation regimen and to increase his activity tolerance and he stated that he would comply.
>
> \*\* \*\* \*\* \*\* \*\*
>
> Plan:
> 1. The patient will follow up with Dr. Erasmus in one month.
> 2. The patient will gradually increase his ambulation regimen as he is able to tolerate it.

*Id.* (emphasis added).

On **December 9, 2004**, Marquez returned to Lovelace for his follow up with Dr. Erasmus. Dr. Erasmus noted:

> Had a foraminotomy one month ago. He is doing reasonably well. I plan to see him back in two months. He was working on his furnace and has some increased pain. His wound is well healed.

Tr. 154, 203.

On **January 27, 2005**, Marquez returned for his follow up with Dr. Erasmus. Tr. 223. Marquez reported he was not doing any better. Dr. Erasmus noted:

> He still has the same symptoms that he had before. **He has an MRI which shows scarring at the surgical site**. I think that we have options for him, epidural steroids, followed by

12

> physical therapy, which we are setting up, or operation with a fusion at that point, and this is a big undertaking. He wanted medication that would not have as much acetaminophen. I gave him a prescription for **Vicoprofen (hydrocodone)**.

Tr. 223 (emphasis added).

On **February 3, 2005**, Marquez returned to the Pain Management Clinic at Lovelace Medical Center. Tr. 221-222. Michael Malizzo, M.D. evaluated Marquez. Dr. Malizzo noted:

> Mr. Marquez returns to clinic today. His chief complaint is pain within the low back. He does have some radiation down into the right buttocks. He does not have significant radicular pain at this time. He said at times his right leg will ache, but that is not that problematic for him. The **patient was having some numbness and tingling in the right foot**. He underwent an L3-4 foraminotomy in October, which has alleviated his symptoms. He has recently had a repeat MRI of the lumbar spine. Dr. Erasmus, his surgeon, has said that the only further option that he has through their clinic would be a fusion. The patient is trying to avoid any further surgery. The patient is taking small amount of Vicoprofen 4 a day. He is doing a very limited home exercise program.
>
> IMAGING STUDIES: MRI of the lumbar spine shows a fusion at L5-S1. The hemilaminectomy[4] and foraminotomy at L3-4, no significant fibrosis is seen. **There is some nerve encroachment at the L3-4 level and L4-5 level, more so on the left than on the right side**.
>
> PHYSICAL EXAM: Blood pressure is 147/62, pulse is 80, respiratory rate is 18. In general, this is an overweight male. He is in mild distress. He is capable of heel-to-toe walk and his gait is non-antalgic. Range of motion of the lumbar spine is decreased secondary to complaints of pain. Straight leg raising is positive for back pain, but no radicular symptoms bilaterally.
>
> IMPRESSION: Mechanical pain of the lumbar spine. **The patient has had epidural injections and trigger point injections in the past. Both of these did alleviate some of his symptoms short term**.
>
> PLAN:
> 1.   We will repeat the epidural steroid injection today. If this is beneficial for him, we can continue to perform these. If not, further [injections] would not be warranted.
> 2.   The patient may be a candidate for facet injections as **he does have some facet arthropathy on MRI**, does have mechanical back pain.

---

[4] Hemilaminectomy is a surgical procedure in which only part of a vertebral lamina and only a portion of the facet joint is removed to allow more room for the lumbar nerve. This nerve is usually compressed due to a progressive degeneration in the spine. The most common reason to have this procedure is due to severe sciatica, numbness or weakness in the leg. Most likely if symptoms are not too severe other things will be tried first, such as physical therapy, rest, and anti-inflammatory medications. http://www.tylerneuro.com/lumbar_hemilaminectomy.htm

> 3. We will refer him to Christine Herman to work on a little bit better home program to see if this will not help alleviate some of his symptoms as he improves back strength and flexibility.
> 4. We will continue him on Vicoprofen 4 per day that was started by Dr. Erasmus. He was given a prescription of 120.

Tr. 221-222 (emphasis added). Dr. Malizzo administered a **lumbar epidural steroid injection** on that day.

On **April 19, 2005**, Marquez returned for his follow up with Dr. Malizzo. Tr. 219, 220. Dr. Malizzo noted:

> Mr. Marquez returns to clinic today. His chief complaint remains pain in the back with radiation into the right buttocks. At times, he will have an achy sensation in his right leg. The patient is status post a right L3-4 foraminotomy and hemilaminectomy. This was done in October of 2004. He did have some improvement of symptoms for short amount of time, but they have now returned. Dr. Erasmus, his surgeon, has said he is a candidate for fusion if he wishes to proceed. He did have an epidural steroid injection performed February 3rd. He states that this did not dramatically [de]crease his symptoms, and more importantly, he felt worse for several days having increased pain that was very difficult to control and also having a warm sensation. The patient was referred to Christine Herman, has been instructed in a home program. He is doing [this program], and he says this has helped some. **He is also using Vicoprofen at up to 4 a day. He feels there are days where he could use a little bit more and is asking for a slight increase**. The patient and his wife are also asking about Social Security Disability paperwork.
>
> IMPRESSION:
> 1. **Degenerative change with radicular symptoms**.
> 2. **Postlaminectomy syndrome**.[5]
>
> The patient did not have good results with his last epidural and did have some worsening of his symptoms. He does seem to get benefit with the Vicoprofen and also with exercise.
>
> PLAN:
> 1. The patient's **Vicoprofen** at next refill will be **increased to maximum of 6 per day**.
> 2. He will be encouraged to continue with the home program.

---

[5] Post-Laminectomy syndrome or failed back syndrome refers to chronic back and/or leg pain that occurs after back (spinal) surgery. Multiple factors can contribute to its onset or development, including scar tissue. Common symptoms associated with post-laminectomy syndrome include diffuse, dull and aching pain involving the back and/or legs. Abnormal sensibility may include sharp, pricking, and stabbing pain in the extremities. http://www.spinephysicians.org/dr0sdodetail.cfm?id=21


      3.    **If this failed to alleviate his symptoms, we can repeat an epidural, or he can return for a consideration of fusion**.

      4.    I explained to the patient's wife that it would be hard for me to place the patient at total and permanent disability.

      5.    The patient was given a six-month follow up for medication check. If things worsen prior to that, if he has other questions, he can schedule an earlier appointment.

Tr. 219-220 (emphasis added).

## B. Listing 1.04

Listing 1.04 governs disorders of the spine and states:

Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disease, facet arthritis, veretebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

    A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-let raising test (sitting and supine);

or

    B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dyesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

    C.    Lumbar spinal stenosis resulting in pseudo-claudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulated effectively, as described in **1.00B2b**.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2002). Under 1.00B2b of the Musculoskeletal

System, a claimant must meet the following criteria:

    B.    Loss of function.
    2.    How We Define Loss of Function in These Listings

    b.    What We Mean by Inability to Ambulate Effectively
    (1)    Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J [Orthotic, Prosthetic, or Assistive Devices]) to permit

>            independent ambulation without the use of a hand-held assistive device(s) that limits
>            the functioning of both upper extremities.
>
> (2)     To ambulate effectively, individuals must be capable of sustaining a reasonable
>            walking pace over a sufficient distance to be able to carry out activities of daily
>            living.  They must have the ability to travel without companion assistance to and
>            from a place of employment or school.  Therefore, examples of ineffective
>            ambulation include, but are not limited to, the inability to walk without the use of
>            a walker, two crutches or two canes, the inability to walk a block at a reasonable
>            pace on rough or uneven surfaces, the inability to use standard public transportation,
>            the inability to carry out routine ambulatory activities, such as shopping and
>            banking, and the inability to climb a few steps at a reasonable pace with the use of
>            a single hand rail.  The ability to walk independently about one's home without the
>            use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2(b).

>    In her decision, the ALJ found Marquez did not meet Listing 1.04, noting:
>
> The medical evidence of record reflects the claimant has a long history of chronic low to moderate level back pain following a fusion at L5-S1 in 1970.  In July 2004, he sought medical treatment at Lovelace Medical Center for acute low back pain after he stepped off into a hole and wrenched his back (Exhibit 1F, at 33).  Radiographic studies dated July 2, 2004 revealed the presence of degenerative changes at L5-S1 with no clear evidence of significant spinal instability (Exhibit 1F, at 17-18).  Trigger point injections on September 2, 2004 and October 11, 2004 gave him "some significant relief" for a week or so but then pain returned especially in the coccyx area (Exhibit 1F, at 13, 16).  On September 29, 2004, the claimant underwent L3-4 foraminotomy for a diagnosis of right L3-4 stenosis (Exhibit 1F, at 10).  By November 9, 2004, his treating source documented the claimant was able to stand from a sitting position without any difficulty or assistance and had a steady gait.  Further, he did not voice any neurological impairment.  By February 3, 2005, the claimant reported he continued to have pain within the low back and some radiation down into the right buttocks; nonetheless, he did not have any significantly radicular pain at that time (Exhibit 6F, at 5).  Unfortunately by April 19, 2005, his pain management physician, Michael Malizzo, M.D. reported that the symptoms the claimant experienced prior to the October 2004 surgery had returned; nonetheless, the claimant seem to get benefit with the medication, vicoprofen and exercise.  Despite the return of symptoms, Dr. Malizzo was of the opinion that the claimant was not totally and permanently disabled (Exhibit 6F, at 3).  Therefore, the requirements of listing 1.04 are not met or approached because claimant['s] to [sic] postoperative pain appears to be non-radicular, but referred pain into coccyx.  There is no evidence the claimant has difficulty ambulating, furthermore there is no evidence of the required motor loss or muscle atrophy.

Tr. 17.  Marquez contends he meets Listing 1.04 (A) and (C).  Specifically, Marquez contends he was diagnosed with an L3-4 disc bulge, L3-4 stenosis of the right side and has been found to

16

have narrowing of the L5-S1 interval disc space, indicating compromise of the spinal cord.  Pl.'s Mem. in Support of Mot. to Remand at 10.

Second, Marquez contends his spinal impairment(s) meet the severity criteria listed under sections A and C of Listing 1.04.  *Id.*  Under section A, Marquez cites to the record, Tr. 100-104, Tr. 176-179, Tr. 219-22, Tr. 221-222, and Tr. 227, to support his claim that he "had significant pain as a result of his back impairment."  *Id.*

The Court has meticulously reviewed the record and finds that the ALJ's finding that Marquez did not experience radicular pain is not supported by the record.  On July 26, 2004, Dr. Muche, assessed Marquez as having "right lower extremity radiculopathy."  Tr. 174; *see also* Tr. 219-220 (Dr. Malizzo's assessment "Degenerative change with radicular symptoms"). Moreover, the August 9, 2004 MRI indicated Marquez had a L3-4 disc bulge, a disorder that can cause nerve root compression.  *See* http://www.spineuniverse.com/displayarticle.php/article554.html; *see also* Tr. 221-222 (Dr. Malizzo's clinical notes– "nerve encroachment at the L3-4 level and L4-5 level, more so on the left than on the right side**).**   The ALJ also noted in her decision:

> Dr. Muche's opinion of disability for loan discharge is not particularly persuasive, as it is [a] general statement of disability, and it appears that she hasn't seen him as much as Dr. Malizzo.  Therefore, the undersigned has afforded the most weight to the opinion of Dr. Malizzo because he is a specialist in pain management and has the longest and most complete treatment history with the claimant.

Tr. 18.  A review of the record does not support these factual findings.  The record indicates that Dr. Malizzo examined Marquez on February 3, 2005 and April 19, 2005.  Dr. Muche, also a specialist in pain management, examined Marquez on July 26, 2004 and August 24, 2004.  Thus, the basis for affording Dr. Malizzo's opinion more weight than Dr. Muche's opinion is not supported by the record.

17

The Court is also concerned that, although the ALJ noted Dr. Muche requested Marquez undergo a formal functional capacity assessment, the ALJ did not request one.  The ALJ also dismissed Marquez' complaints of severe pain "in view of the relatively weak medical evidence . . . ." Tr. 19.  The record indicates that a neurosurgeon and three physiatrists diagnosed Marquez with very serious disorders, a bulging intervertebral disc (Tr.169-170), facet arthrophy on MRI (Tr.221), right L3-4 stenosis (Tr. 159), coccydnia (Tr. 162), retrolisthesis of L3 and L4 (Tr. 178-179), degenerative disc disease of the lumbar spine (with small osteophytes) (Tr. 205); osteoarthritis (Tr. 230) and post-laminectomy syndrome (Tr. 219).  Moreover, Marquez underwent several invasive procedures including surgery, epidural steroid injections, and trigger point injection in order to obtain some relief from his pain.  Marquez was also taking narcotic analgesics and muscle relaxants on a regular basis and required increasing amounts after his surgery.  Thus, the ALJ's reason for dismissing Marquez' complaints of severe pain, i.e., "relatively weak medical evidence," is not supported by the record.

The Court will remand this case to allow the ALJ to order a formal functional capacity assessment and request a Medical Source Statement from Dr. Muche.  The ALJ will also provide the requirements of Listing 1.04 to Dr. Muche.  However, the Court expresses no opinion as to the extent of Marquez' impairment(s), or whether he is or is not disabled within the meaning of the Social Security Act.  The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**